**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN, *et al.*;<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*;<br><br>Defendants. | Case No. 1:25-cv-00184-AHA<br>Hon. Amir H. Ali |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs hereby move for summary judgment on all counts under Fed. R. Civ. P. 56. Pursuant to 8 C.F.R. 236.6 (the "Records Rule"), Defendants prohibit state and local entities from disclosing any records related to noncitizens they detain on behalf of Defendant ICE—even if those records were created by the state or local entity, and even if ICE does not independently possess them (and therefore cannot separately disclose them in response to a federal FOIA request). As explained in the accompanying memorandum (which also responds to Defendants' motion for summary judgment, ECF No. 38), Defendants lack the statutory authority to prohibit state and local entities from disclosing state and local records that ICE does not independently possess. In addition, the Records Rule is arbitrary and capricious because of its inexplicably excessive and indiscriminate scope. Accordingly, the Records Rule violates the Administrative Procedure Act (APA) insofar as it prohibits state and local entities from disclosing state and local records that ICE does not independently possess.

Plaintiffs respectfully request that the Court grant summary judgment to Plaintiffs and deny summary judgment to Defendants; declare that the Records Rule is contrary to law, in excess of statutory authority, and arbitrary and capricious insofar as it prohibits state and local entities from disclosing state and local records that ICE does not independently possess; and vacate the Records Rule insofar as it prohibits state and local entities from disclosing state and local records that ICE does not independently possess.

A proposed order is attached for the Court's convenience.

Respectfully submitted,

*/s/ Ramis J. Wadood*
Ramis J. Wadood*
Marc Allen*
Philip E. Mayor*
Bonsitu Kitaba-Gaviglio*
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800
rwadood@aclumich.org
mallen@aclumich.org
pmayor@aclumich.org
bkitaba@aclumich.org

*/s/ My Khanh Ngo*
My Khanh Ngo (D.D.C. Bar #CA00219)
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
Phone: (415) 343-0770
mngo@aclu.org

*/s/ Kyle Virgien*
Kyle Virgien*
American Civil Liberties Union Foundation
National Prison Project
425 California Street, 7th Floor
San Francisco, CA 94104
Phone: (415) 343-0770
kvirgien@aclu.org

Attorneys for Plaintiffs

*Admitted *pro hac vice*

Dated: November 10, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN, *et al.*;

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*;

Defendants.

Case No. 1:25-cv-00184-AHA
Hon. Amir H. Ali

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

I. The Records Rule and its History. ........ 2

II. Defendants' Application of the Records Rule. ........ 3

III. The Effect of the Records Rule on Plaintiffs' State FOIA Requests. ........ 4

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. The Records Rule Violates the APA Because It Exceeds Defendants' Statutory Authority and Is Contrary to Law. ........ 7

a. Sections 1103(a)(2) and (a)(11) do not authorize the Records Rule. ........ 9

b. The INA's generic housekeeping provisions—§§ 1103(a)(1) and (a)(3)—do not and cannot independently authorize the Records Rule. ........ 11

c. The other sources of authority mentioned in the Preamble are misplaced and inapplicable to the Records Rule. ........ 15

II. The Records Rule Violates the APA Because It Is Arbitrary and Capricious. ........ 17

a. The agency failed to consider an important problem posed by the Records Rule. ........ 17

b. The Records Rule does not adequately explain the connection between the Rule's scope and the problem it sought to address. ........ 19

III. Defendants' Discussion of Facial Challenges Is Misplaced Because Plaintiffs Are Not Seeking Wholesale Vacatur of the Records Rule. ........ 21

CONCLUSION ........ 24

## INDEX OF AUTHORITIES

### Cases

*ACLU of New Jersey v. Cnty. of Hudson*, 799 A.2d 629 (N. J. Super. Ct. App. Div. 2002) .......... 2

*Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717 (D. Md. 2025) .......... 21

*Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) .......... 3, 6

*Arpaio v. Obama*, 27 F. Supp. 3d 185 (D.D.C. 2014) .......... 13

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) .......... 12

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) .......... 23

*Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022) .......... 22

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .......... 16

*Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022) .......... 23

*Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123 (D.C. Cir. 1994) .......... 6, 22

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) .......... 8, 13

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......... 8

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) .......... 10

*Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134 (D.C. Cir. 2006) .......... 14

*Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020) .......... 19

*Doe v. Edlow*, 836 F. Supp. 3d 775 (S.D. Ohio 2026) .......... 12

*Gonzales & Gonzales Bonds & Ins. Agency v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024) .......... 14

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) .......... 10

*Haig v. Agee*, 453 U.S. 280 (1981) .......... 16

*Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) .......... 18, 19

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028 (D.C. Cir. 2023)..................... 12

*Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162 (D.C. Cir. 2022) ............................................... 6

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)................................................................... 8

*Leather Indus. of Am. v. EPA*, 40 F.3d 392 (D.C. Cir. 1994) ...................................................... 21

*Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002) ......................................................................... 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................. 8

*Luna Gutierrez v. Noem*, 811 F. Supp. 3d 133 (D.D.C. 2025) .......................................... 8, 14, 15

*Metro. Gov't of Nashville & Davidson Cnty. v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ---- (D.D.C. Sept. 28, 2026) ................................................................................ 7, 8, 22

*Michigan v. U.S. Dep't of Energy*, 191 F.4th 677 (D.C. Cir. 2026) .............................................. 8

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................................................... 17, 19, 21

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020)............................................... 22

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177 (D.C. Cir. 2020)......................... 23

*Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025) .................................................. 12

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185 (D.C. Cir. 2026)........................................................................................................................... 9

*Neguse v. U.S. Immigr. & Customs Enf't*, 813 F. Supp. 3d 45 (D.D.C. 2025).............................. 8

*NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130 (D.C. Cir. 2001).................................... 8

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ............................................................................ 16

*omcast Corp. v. FCC,* 600 F.3d 642 (D.C. Cir. 2010)................................................................. 15

*Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164 (D.C. Cir. 1994)............................................. 20

*Quinteros-Mendoza v. Holder*, 556 F.3d 159 (4th Cir. 2009) ..................................................... 13

*Save Jobs USA v. U.S. Dep't of Homeland Sec., Off. of Gen. Couns.*, 111 F.4th 76 (D.C. Cir. 2024)................................................................................................................ 14

*Schism v. United States*, 316 F.3d 1259 (Fed. Cir. 2002) ........................................................... 13

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ........ 23

*Stewart v. Azar*, 366 F. Supp. 3d 125 (D.D.C. 2019) ........ 18

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ........ 15

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........ 10

**Statutes**

5 U.S.C. § 706 ........ 6, 7, 8, 17

6 U.S.C. § 557 ........ 9

8 U.S.C. § 1103 ........ 9, 10, 11, 13

8 U.S.C. § 1226 ........ 16

**Rules**

Fed. R. Civ. P. 56 ........ 6

**Regulations**

67 Fed. Reg. 19508 (Apr. 22, 2002) ........ 3, 20

68 Fed. Reg. 4364 (Jan. 29, 2003) ........ 2, 10, 18, 20

8 C.F.R. § 236.6 (2003) ........ 2

**Other Authorities**

Deportation Data Project, *Number of Book-Ins to ICE Detention by Month* ........ 20

*Inter-Governmental Service Agreement Between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Detention and Removal and Calhoun County Sheriff's Department* (August 2007) ........ 3

Transactional Records Access Clearinghouse, *Immigration Detention Quick Facts* ........ 21

U.S. Immigration and Customs Enforcement, *Detention Facilities* ........ 20

## INTRODUCTION

This lawsuit challenges Defendants' application of a federal regulation, 8 C.F.R. § 236.6 (2003) ("the Records Rule" or "the Rule"), to prohibit state and local jails that detain noncitizens for immigration purposes from disclosing any records about those noncitizens under state public records laws. Specifically, Plaintiffs challenge the Records Rule and seek partial vacatur of the Rule as it applies to locally created and maintained records that Defendants do not possess, and that therefore cannot be obtained via the federal Freedom of Information Act (FOIA). The Records Rule's application to these local records renders most information about immigration detention in state and local facilities completely secret.

Although initially promulgated after 9/11 to prevent the disclosure of information related to noncitizens suspected of terrorism, the Records Rule is applied much more broadly, reaching every record about every noncitizen in every state- or local-run detention center nationwide. No statute ever authorized Defendants to promulgate a rule prohibiting non-federal government agencies from disclosing *their own* records under longstanding public records laws, especially when those records are not in Defendants' possession and are thus unavailable through federal FOIA. Nor have Defendants offered any reasoned basis or adequate explanation for applying the Records Rule to those local records. Accordingly, the Records Rule exceeds Defendants' statutory authority, is contrary to law, and is arbitrary and capricious under the Administrative Procedure Act ("APA"). The Rule must be vacated insofar as it prohibits state and local agencies from disclosing their own records that Defendants do not independently possess.

## STATEMENT OF FACTS

### I. The Records Rule and its History.

The Records Rule states, in relevant part, that no state or local agency which detains noncitizens on behalf of ICE "shall disclose or otherwise permit to be made public the name of, or other information relating to, such detainee." 8 C.F.R. § 236.6 (2003). That information, according to the Rule, instead "shall be under the control of [ICE] and shall be subject to public disclosure only pursuant to the provisions of applicable federal laws, regulations and executive orders." *Id.* The Rule goes on to pronounce that such information "shall not be public records." *Id.*

The Records Rule was issued in the wake of the September 11, 2001, terrorist attacks. In response to the imminent disclosure of information related to suspected terrorists detained in two New Jersey county jails in September 2001, the Immigration and Naturalization Service (Defendant ICE's predecessor enforcement agency) issued the Records Rule as an emergency interim rule, effective immediately, in an attempt to bar the disclosure of the requested records. *See ACLU of New Jersey v. Cnty. of Hudson*, 799 A.2d 629 (N. J. Super. Ct. App. Div. 2002). Because of the Records Rule, the two county jails withheld the requested detention records despite the traditional availability of the requested records under New Jersey's Right-to-Know Law. *See id.*

After a brief comment period and without any changes, the Records Rule was issued as a final rule on January 29, 2003. The agency received four comments, all of which opposed the rule and expressed concerns about its legality. In response to a comment alleging the Records Rule exceeded statutory authority, the Preamble to the final Rule cites the following sources of authority: 8 U.S.C. § 1103, 8 U.S.C. § 1226, 8 U.S.C. § 1231, and the general proposition of federal plenary power over immigration and national security matters. 68 Fed. Reg. 4364 (Jan. 29, 2003) (the "Preamble"). The Preamble also "adopts the analysis and legal authority in the supplementary

information to the interim rule as support for" its own promulgation. *Id.* at 4366. The interim rule, in turn, focused on 8 U.S.C. § 1103(a) as its primary source of authority. 67 Fed. Reg. 19508, 19509 (Apr. 22, 2002).

### II. Defendants' Application of the Records Rule.[1]

Despite being issued as a post-9/11 regulation to shield information related to noncitizens suspected of terrorism, Defendants apply the Records Rule much more broadly. A plain reading of the Records Rule shows that it prohibits *any* entity (or person) detaining noncitizens on behalf of ICE from disclosing *any* records or information related to those individuals for *any* reason. That includes detention records that local jails routinely create to document information about the people they detain, such as booking and intake forms, medical records, grievances, disciplinary history, and communications with jail staff. *See* Compl., ECF No. 1, at ¶¶ 4, 38, 55. In all contexts outside of immigration, county jails around the country regularly disclose such records under state public disclosure laws. *Id.* at ¶¶ 2–3. But ICE uniquely uses the Records Rule to assert control over these local records even though they were created by the county and are solely in the county's—not ICE's—possession.[2] *Id.* at ¶¶ 4–5, 21. And in most cases, ICE has never even seen the records

---

[1] Although the arguments in this motion do not rest on them, the allegations in Parts (II) and (III) of this section are provided as "'background information'" to illustrate the operation of the rule. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). They are not part of the administrative record, as Defendants failed to locate an administrative record in this matter. *See* Notice, ECF No. 35. Defendants do not dispute any of Plaintiffs' allegations in their motion for summary judgment—nor can they. *See* Defs.' Mot., ECF No. 38, at pp. 1–4. In fact, Defendants' motion for summary judgment relies significantly on Plaintiffs' complaint for the relevant facts. *See id.*

[2] ICE does not appear to even claim control over local detention records in its detention contracts with local agencies. Under Article IX ("Inspection") of ICE's contract with the Calhoun County Sheriff's Office, the county "shall, upon request, grant ICE access to any record in its possession, regardless of whether the [county jail] created the record, concerning any detainee held pursuant to this Agreement." *Inter-Governmental Service Agreement Between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Detention and Removal and Calhoun County Sheriff's Department* (August 2007),

they claim to "control." *Id.* As a result, ICE is prohibiting local jails from releasing those records while also failing to disclose those same records in response to federal FOIA requests (because, of course, they do not possess the records). *Id.* at ¶¶ 5, 21, 52.

Contrast these county records with those created and maintained by Defendants. DHS and ICE routinely create forms and other records when they choose to arrest and detain a noncitizen, such as a Forms I-200 (an administrative arrest warrant), I-213 (a record of information about the arrested noncitizen), I-247A (a detainer request to maintain custody of a noncitizen), I-286 (a notice of ICE's custody determination), and I-862 (a notice to appear in immigration court). Many of these forms are provided to the county jail where the noncitizen is detained, meaning that the county jail and Defendants all possess those forms. But because Defendants initially created these forms, and continue to maintain a copy of them, they can (and normally do) disclose them in response to federal FOIA requests—unlike county-created records. As such, the application of the Records Rule to ICE's own forms is not at issue in this lawsuit.

### III. The Effect of the Records Rule on Plaintiffs' State FOIA Requests.

Plaintiffs have been injured by Defendants' expansive application of the Records Rule multiple times in the last few years. As a part of their organizational mission to provide legal assistance to immigrants and promote government transparency, Plaintiffs have submitted multiple state FOIA requests to county jails seeking records related to particular individuals detained on behalf of Defendant ICE. *See* Compl., ECF No. 1, at ¶¶ 33–36. Michigan's FOIA makes most county jail records readily available to the public. *Id.* at ¶¶ 2–3, 28, 36. But in response to each

---

https://www.documentcloud.org/documents/1644160-calhoun-county-mi-igsa-contract. That provision also requires the county to "retain all records where this right of access applies for a period of two (2) years." This is a far cry from ICE deeming those records property of ICE. Much to the contrary, the agreement merely guarantees ICE access—*upon request*—to records created and maintained by Calhoun County (and for only two years, at that).

request, those county jails have denied Plaintiffs' FOIA requests based on the Records Rule. *Id.* at ¶¶ 41–42, 56–58. For example, in 2019, Plaintiffs sent a state FOIA request to Calhoun County—whose jail detains immigrants on behalf of ICE—seeking records related to Jilmar Ramos-Gomez, a U.S. citizen unlawfully detained there by ICE. *Id.* at ¶¶ 37–39. Calhoun County denied that request, and after Plaintiffs filed a state lawsuit challenging the denial, Defendants made clear that the primary basis for their denial was the Records Rule. *Id.* at ¶¶ 39–42. After a years-long legal saga that culminated in a unanimous Michigan Supreme Court decision holding that the Michigan FOIA did not provide an exemption that would allow the records to be withheld under the Rule, Defendant ICE finally permitted the county to release the records Plaintiffs sought. *Id.* at ¶¶ 40–47. But soon after that release came the revelation that it was a one-time exception: Calhoun County informed Plaintiffs that, for any future FOIA requests, ICE was instructing them to continue denying the requests based on the Records Rule. *Id.* at ¶¶ 48–49. Calhoun County also stated that ICE had expressly rejected a proposal that, whenever a state FOIA request is made for immigration detention records, those records could be provided to ICE so that ICE could produce them through the federal FOIA. *Id.*

By instructing Calhoun County to withhold records—even those that Defendants do not possess—pursuant to the Records Rule, Defendants have completely shielded these quintessentially public records from disclosure.

Calhoun County has followed ICE's instructions. Months after the Ramos-Gomez matter was resolved, Plaintiffs submitted two state FOIA requests seeking records related to Luisa Martinez Orozco, a noncitizen detained at Calhoun County's jail. *Id.* at ¶¶ 53–58. Calhoun County denied both requests on the basis of the Records Rule and told Plaintiffs to make their request to ICE instead. *Id.*

Plaintiffs regularly seek, and will continue to seek, records from Michigan jails detaining immigrants for ICE—records that would otherwise be disclosable under the Michigan FOIA but for the Records Rule. *Id.* at ¶¶ 68–69. Plaintiffs filed this APA lawsuit challenging Defendants' application of the Records Rule because Calhoun County has informed them that it will continue denying state FOIA requests for records related to detained immigrants due to the Records Rule. *Id.* at ¶¶ 48–49, 70. The three other county jails in Michigan that contract to detain noncitizens for ICE—not to mention all other state and local jails with detention contracts nationwide—are likewise covered by the Records Rule. *See id.* at ¶¶ 67, 71. Unsurprisingly, numerous FOIA requestors nationwide have likewise been injured by the Records Rule when attempting to seek local records about detained noncitizens. *See id.* at ¶¶ 6, 63–67.

**LEGAL STANDARD**

A "court shall grant summary judgment if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In Administrative Procedure Act (APA) cases, judicial review is typically limited to "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. That record includes the challenged regulation and any evidence or reports before the agency at the time the regulation was promulgated. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

If the reviewing court finds that the challenged regulation violates the APA, the court "shall" vacate and set aside the regulation. 5 U.S.C. § 706(2). *See also Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 179 (D.C. Cir. 2022) (vacatur of the challenged regulation is the "normal remedy" for an APA violation). The court need not vacate the whole rule, and instead may vacate only "the part of a rule found to be invalid . . . ." *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994). *See also Metro. Gov't of Nashville & Davidson Cnty. v. U.S. Dep't of Homeland*

*Sec.*, --- F. Supp. 3d ----, 2026 WL 2905123, at *9 (D.D.C. Sept. 28, 2026) (recognizing the availability of "partial vacatur" in APA cases).

## ARGUMENT

By prohibiting state and local agencies from disclosing their own public records (which Defendants do not independently possess), the Records Rule violates the APA twice over: not only does the Rule exceed Defendants' statutory authority, but it is also arbitrary and capricious because it bears little relevance to the emergency post-9/11 justifications for the rule. *See* 5 U.S.C. § 706(2)(A), (C). While either of these APA violations alone would suffice to "hold unlawful and set aside" the Rule, 5 U.S.C. § 706(2), this Court should remedy Defendants' APA violations by vacating the Rule insofar as it prohibits the disclosure of locally created and maintained detention records that ICE does not independently possess.

### I. The Records Rule Violates the APA Because It Exceeds Defendants' Statutory Authority and Is Contrary to Law.

By reaching far beyond Defendants' own records and prohibiting state and local agencies from disclosing public records they created and exclusively maintain, the Records Rule exceeds Defendants' statutory authority and is contrary to law. None of the provisions cited by Defendants or the Preamble contains any language suggesting—let alone clearly conferring—the authority to promulgate rules that would override state public disclosure laws and render non-DHS records possessed by non-federal agencies secret. First, neither of the substantive provisions Defendants cite in their summary judgment motion—§ 1103(a)(2) and (a)(11)—contain any language that would even remotely authorize the Rule. Second, the only two other provisions Defendants rely on—§ 1103(a)(1) and (a)(3)—are mere housekeeping provisions that confer no substantive grant of authority on their own. And third, the Preamble's grab-bag of remaining purported authorities does not save the Rule either.

As to all three of these arguments, the legal principles are the same. "'[A]n agency' like DHS 'literally has no power to act . . . unless and until Congress confers power upon it.'" *Neguse v. U.S. Immigr. & Customs Enf't*, 813 F. Supp. 3d 45, 92 (D.D.C. 2025) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). The APA thus requires a court to invalidate an agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).[3] *See also NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001), *aff'd*, 537 U.S. 293 (2003). Courts reviewing agency action under the APA must independently interpret the statute that the agency claims authorizes its actions and "effectuate the will of Congress . . . by recognizing constitutional delegations, fixing the boundaries of the delegated authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (cleaned up). *Accord Michigan v. U.S. Dep't of Energy*, 191 F.4th 677, 691, 698 (D.C. Cir. 2026). In other words, Defendants "must be able to identify 'some delegation of the requisite legislative authority by Congress'" to justify the challenged regulation. *Metro. Gov't of Nashville*, --- F.Supp.3d ---- at *6 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979)). Defendants have not, and cannot, point to any provision of the INA that authorizes the Records Rule. Because the Records Rule does far more than what Congress authorized, this Court should vacate the Rule insofar as it prohibits disclosure of locally created and maintained records that Defendants do not independently possess.

---

[3] Claims alleging a rule is "not in accordance with law" under § 706(2)(A) and "in excess of statutory . . . authority" under § 706(2)(C) are functionally identical. *See City of Arlington v. FCC*, 569 U.S. 290, 299 (2013) ("[T]here is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." (emphasis in original)). *See also Luna Gutierrez v. Noem*, 811 F. Supp. 3d 133, 158 n.10 (D.D.C. 2025) ("[U]nder the APA the proper response to unlawfulness is the same regardless of the theory—to 'hold unlawful and set aside' the relevant agency action.").

***a. Sections 1103(a)(2) and (a)(11) do not authorize the Records Rule.***

Defendants and the Preamble rely on only two substantive provisions of 8 U.S.C. § 1103(a) to support the Records Rule: §§ 1103(a)(2) and (a)(11). But neither of these provisions authorize the Rule. Only § 1103(a)(2) is remotely relevant to public disclosure of detention records, but that recordkeeping provision cannot reasonably be construed to reach local records that Defendants did not create and do not possess. And § 1103(a)(11), which concerns construction contracts, is wholly inapposite to regulating detention records.

Section § 1103(a)(2) gives the DHS Secretary "control, direction, and supervision of all employees and of all the files and records of the Service." This recordkeeping provision is the only provision cited in Defendants' summary judgment motion and the Preamble to even mention records. But the provision is abundantly clear on its face: the terminal phrase "of the Service" expressly indicates that the Secretary shall exercise control only over the files and records *of the (successors of) the Service:* namely, ICE, CBP, and USCIS.[4] At most, the provision implies control over all DHS records. But the provision in no way suggests that the phrase "of the Service" also includes the exact opposite—i.e., that the Secretary may control records created and solely maintained by *non-DHS* entities (like county jails). If Congress had intended such a far-reaching result, it certainly would have said so. *See Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1235 (D.C. Cir. 2026) ("Congress does not hide elephants in mouseholes." (internal quotations omitted)).

Looking at the provision as a whole further supports this common sense and plain text reading. The provision's adjacent reference to "all employees . . . of the Service" can only

[4] *See* 6 U.S.C. § 557 ("reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the . . . component of [DHS] to which such function is so transferred.").

reasonably be read to mean that the DHS Secretary can exercise control over DHS employees (at most). The Secretary presumably could not contort this authority to issue regulations governing pay, discipline, or hiring practices in county jails nationwide simply because those jails contract to detain some noncitizens for ICE. So, too, for "files and records of the Service." This court should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quotation marks and citation omitted). This is doubly true when such a broad reading would run counter to numerous state and local public disclosure laws. "When the federal government deals with state and local governments, it must turn square corners." *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020). *Cf. Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (cleaned up)).

Next, Defendants and the Preamble invoke 8 U.S.C. § 1103(a)(11) as an additional source of authority for the Records Rule. They claim that the Rule simply furthers DHS's authority under § 1103(a)(11) to "enter into agreements with State and local governments for the housing of" detained immigrants. Defs.' Mot., ECF No. 38, p. 2. *See also* 68 Fed. Reg. 4364, 4365 (reciting same description and citing 8 U.S.C. § 1103(a)(9)(A), a prior version of § 1103(a)(11)(A)). But this description of the provision is overbroad to the point of being inaccurate. The actual text of § 1103(a)(11)(B) makes clear that it authorizes contracts only for "the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services . . . ."[5] This construction provision

[5] Section 1103(a)(11)(A) merely authorizes the disbursement of funds to pay state and local governments for detention services they provide under existing contracts. It does not itself authorize entering into any contracts.

clearly does not contemplate the sweeping power to allow the federal government to contract (let alone regulate) in a way that would compel local governments to violate generally applicable state laws—especially state public disclosure laws that have nothing to do with the construction of detention facilities.[6] Nothing in § 1103(a)(11) remotely alludes to the authority to limit access to public records created and exclusively possessed by local governments regarding detained noncitizens.

Thus, neither §§ 1103(a)(2) nor (a)(11), together or alone, provides any substantive authority for the Records Rule insofar as it prohibits local entities from disclosing their own records that Defendants do not possess.

#### ***b. The INA's generic housekeeping provisions—§§ 1103(a)(1) and (a)(3)—do not and cannot independently authorize the Records Rule.***

The other two provisions Defendants rely on—§§ 1103(a)(1) and (a)(3)—do not authorize the Records Rule either because they are mere housekeeping provisions that confer no substantive grant of authority on their own. Section 1103(a)(1) merely describes who is authorized to administer the immigration laws, and § 1103(a)(3) merely confirms that those administrators have rulemaking authority. Such generic authorizing provisions—found in virtually every cabinet agency's organic statute—cannot independently authorize substantive and far-reaching regulations like the Records Rule.

Section 1103(a)(1) is a general provision that simply defines the DHS Secretary's duties: "the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of" noncitizens, subject to some reserved authorities for the President, Attorney General, and State Department officials. By generically charging the DHS Secretary with the

---

[6] Indeed, Defendants' contract with Calhoun County does not even *attempt* to claim control over or limit public access to county records. *See supra* fn. 2.

administration of the immigration laws, the provision confers only "a duty, not a wellspring of authority" to carry out specific substantive functions. *Doe v. Edlow*, 836 F. Supp. 3d 775, 823 (S.D. Ohio 2026). *See also Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 845 (N.D. Cal. 2025) (section 1103(a)(1) is "simply a general provision").

Instead of providing some (unspecified) substantive grant of authority, § 1103(a)(1) just authorizes the DHS Secretary to administer and enforce *the remaining provisions* of the INA and any other immigration laws. In the very few instances when the D.C. Circuit has interpreted the "administration and enforcement" language of § 1103(a)(1), it has interpreted this language to merely authorize administering and enforcing *some other* INA program. For example, in *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, the court concluded § 1103(a)(1) merely authorized DHS to "polic[e] compliance" with the H-1B visa program. 71 F.4th 1028, 1037 (D.C. Cir. 2023). But the authority to actually implement or regulate the program derived from 6 U.S.C. § 271(b)(5) and 8 U.S.C. § 1184(c)(1)—not from § 1103(a)(1) itself. *See id.* Put differently, § 1103(a)(1)'s secondary administration-and-enforcement authority did not itself give DHS the authority to issue H-1B visas or create eligibility requirements for the H-1B program. Other substantive provisions of the INA and the Homeland Security Act did. *See also Arpaio v. Obama*, 797 F.3d 11, 15–16 (D.C. Cir. 2015) (noting that § 1103(a)(1) simply vested the DHS Secretary with discretion to enforce the INA's many substantive removal provisions). Section 1103(a)(1) has never been held to create the type of sweeping authority that could override and preempt state public disclosure laws, and Defendants cite no cases suggesting otherwise. Section 1103(a)(1) therefore could not authorize the Records Rule on its own.

But even if § 1103(a)(1) conferred some substantive authority, the provision's plain language circumscribes that authority to "the administration and enforcement of *immigration and*

*naturalization*." 8 U.S.C. § 1103(a)(1) (emphasis added); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 192 (D.D.C. 2014) (section 1103(a)(1) charges the DHS with "enforcement of the statutory scheme"). The Records Rule does not enforce, police compliance with, or otherwise respond to violations of the immigration laws. Nor does it administer or even facilitate the naturalization process. Instead, it restricts the release of routine (and quintessentially public) detention records by non-federal entities—a regulation that reaches far beyond even the most generous reading of § 1103(a)(1).

8 U.S.C. § 1103(a)(3) is even less substantive than (a)(1). That provision is simply the INA's generic grant of rulemaking authority, giving the DHS Secretary authority to "establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of this chapter." 8 U.S.C. § 1103(a)(3). But all that this generic "carrying out" authority does is allow DHS to issue regulations that are needed to support actions taken pursuant to *other* substantive delegations of authority in the INA. It does not, by itself, confer substantive authority to DHS. *See, e.g., Quinteros-Mendoza v. Holder*, 556 F.3d 159, 162–164 (4th Cir. 2009) (recognizing § 1103(a)(3) is merely a "simple grant of regulatory authority" that does not otherwise expand the agency's discretion); *Lomont v. O'Neill*, 285 F.3d 9, 16–17 (D.C. Cir. 2002) (describing the Treasury Department's parallel authority in 26 U.S.C. § 7805(a) to "'prescribe all needful rules and regulations for the enforcement of this title'" as "nothing more than a general grant of interpretative rulemaking power" which "cannot support" substantive rulemaking); *Chrysler Corp.*, 441 U.S. at 309–310 (describing a similar generic rulemaking provision, 5 U.S.C. § 301, as a "'housekeeping statute'" that "seems to be simply a grant of authority to the agency to regulate its own affairs."); *Schism v. United States*, 316 F.3d 1259, 1280–1281 (Fed. Cir. 2002) (same); *see also Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir.

2006) ("An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.").

In other words, § 1103(a)(3) grants "only interstitial authority to the Secretary," meaning that the "core statutory basis for" a regulation must be found in some other substantive provision. *Luna Gutierrez*, 811 F. Supp. 3d at 160; *see also Save Jobs USA v. U.S. Dep't of Homeland Sec., Off. of Gen. Couns.*, 111 F.4th 76, 79 (D.C. Cir. 2024) (any gap-filling authority granted by § 1103(a)(3) must be "reasonably related to the duties imposed upon" the Secretary elsewhere). That is why courts consistently interpret § 1103(a)(3) only in tandem with some other substantive provision. *See, e.g., Luna Gutierrez*, 811 F. Supp. 3d at 160 (pairing § 1103(a)(3) with 8 U.S.C. § 1231); *Save Jobs USA*, 111 F.4th at 79 (pairing § 1103(a)(3) with 8 U.S.C. § 1184(a)(1)); *Gonzales & Gonzales Bonds & Ins. Agency v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1076 (9th Cir. 2024) (pairing § 1103(a)(3) with 5 U.S.C. § 3348(a)(2)(A)).

Surely, DHS could issue a § 1103(a)(3) regulation to "carry out" its § 1103(a)(2) authority to "control . . . the files and records of the Service," or its § 1103(a)(11) authority to enter into construction contracts. But since Congress did not authorize DHS to control *non-Service* records under § 1103(a)(2), or to regulate access to public records at all under (a)(11), Congress also did not delegate authority under § 1103(a)(3) to issue an end-run regulation that would do those exact things.

Despite these provisions' plain text and the interpretive caselaw, Defendants would like this Court to accept that §§ 1103(a)(1) and (a)(3) actually confer "broad and express authority to promulgate appropriate immigration regulations." Defs.' Mot., ECF No. 38, p. 2. Defendants' preferred reading of these provisions is not only atextual, but it would also effectively grant DHS limitless authority to promulgate immigration-related regulations. This Court should reject this

dangerously broad reading, which would "virtually free [DHS] from its congressional tether." *Comcast Corp. v. FCC,* 600 F.3d 642, 655 (D.C. Cir. 2010); *see also Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) ("[W]e might well hesitate to conclude that Congress intended to grant the [FCC] substantive authority in section 706(a) if that authority would have no limiting principle.").

In sum, §§ 1103(a)(1) and (a)(3) are merely housekeeping provisions that confer no substantive grant of authority on their own. Section 1103(a)(1) simply describes who is responsible for administering the INA, and § 1103(a)(3) simply confirms that those officials may promulgate regulations in the course of their administration. And even if these provisions can be bootstrapped to confer some modicum of substantive authority independently, no reasonable reading of either provision encompasses promulgating a rule restricting the public's access to local and traditionally public records that are not even in Defendants' possession. Plainly, neither § 1103(a)(1) nor (a)(3)—together or alone—authorize the Records Rule.

***c. The other sources of authority mentioned in the Preamble are misplaced and inapplicable to the Records Rule.***

The Preamble cites three other purported sources of authority for the Records Rule: 8 U.S.C. § 1226, 8 U.S.C. § 1231, and the federal government's plenary authority over immigration and national security. *See* 68 Fed. Reg. at 4364–4365. Defendants abandon these authorities altogether in their summary judgment motion, and for good reason: they are even less applicable to disclosure of local detention records than is 8 U.S.C. § 1103(a).

First, 8 U.S.C. §§ 1226 and 1231 are the general authorizing statutes for ICE's immigration detention and removal apparatus. While they may be "relevant to defining the general contours" of the agency's detention and removal responsibilities, they "do not shed light on whether" the Records Rule is specifically authorized by the INA. *Cf. Luna Gutierrez*, 811 F. Supp. 3d at 159.

Even a superficial look at the detention statutes makes clear that they do not authorize the Records Rule. Not a word in §§ 1226 or 1231 imposes obligations or restrictions on state and local entities, nor does any word in these provisions authorize DHS to do so.[7] In fact, the only language in either provision even remotely addressing detention records is an irrelevant requirement for the Attorney General to develop a computer database of noncitizens convicted of aggravated felonies. 8 U.S.C. § 1226(d)(1)(C). This, no doubt, could explain Defendants' decision to not even attempt to invoke § 1226 in their motion for summary judgment.

Second, the Preamble's Hail-Mary invocation of the federal plenary power over immigration and national security does nothing to clarify whether Congress authorized the agency to promulgate the Records Rule. In other words, that the federal government has plenary power in an area does not mean federal agencies can flout the basic constraints of federalism and the separation of powers when exercising that power. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Haig v. Agee*, 453 U.S. 280, 306 (1981) (evaluating the Secretary of State's authority under the Passport Act despite invocations of the federal government's national security and foreign policy powers). *Cf. Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021) ("as this Court has long made plain, pleas of administrative inconvenience and self-serving regulations never justify departing from the statute's clear text.") (cleaned up).

***

[7] In fact, § 1226 does quite the opposite, requiring the federal government to make certain information available to the states. *See* 8 U.S.C. § 1226(d).

Defendants have not pointed to any statutory authority justifying the Records Rule's application to locally created and maintained records. That is because they cannot. The Rule exceeds Defendants' statutory authority and is contrary to law. For that reason alone, it must be set aside.

## II. The Records Rule Violates the APA Because It Is Arbitrary and Capricious.

The Records Rule's prohibition on the disclosure of state and local records that ICE does not possess is also arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). When deciding whether an agency action is arbitrary and capricious, courts consider whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Normally, an agency action is arbitrary and capricious if the agency failed to "consider an important aspect of the problem" or if the explanation for the action "runs counter to the evidence before the agency." *Id.*

The Records Rule is arbitrary and capricious for both of those reasons: the agency not only (1) failed to consider a crucially important problem with the Records Rule—i.e., the inability to disclose detention records that the federal government does not possess—but also (2) failed to provide a satisfactory explanation for treating all detained noncitizens the same despite the main justification for the Records Rule being the post-9/11 national security emergency.

### ***a. The agency failed to consider an important problem posed by the Records Rule.***

The Records Rule is arbitrary and capricious because it "entirely failed to consider an important aspect of the problem," *State Farm,* 463 U.S. at 43: Because ICE does not possess most locally created detention records, it would not be able to disclose them in response to a federal

FOIA request, which the Preamble says would be the exclusive route to access detention records. 68 Fed Reg. at 4366. Such a failure in consideration "is a 'major shortcoming[ ]' generally warranting vacatur." *Stewart v. Azar*, 366 F. Supp. 3d 125, 155 (D.D.C. 2019) (quoting *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017)).

This problem is, of course, at the heart of this case. *See supra* Statement of Facts at Part II; Argument at Part I. But the problem was as apparent when the Rule was promulgated as it is in Plaintiffs' pleadings. The Preamble identifies only four comments, all of which opposed the Rule.[8] At least three of those comments raised constitutional and practical concerns with the resulting inability of third parties to access detention records, including at the state and local level. *See* 68 Fed Reg. at 4364. In response, the Preamble simply asserts that the federal FOIA "has a long history of success in providing for proper public access to information" and that there is no reason to believe that would not continue to be true. 68 Fed. Reg. at 4366.[9] Defendants, too, argue that the federal FOIA is the proper channel for public records requests involving immigration detention. Defs.' Mot., ECF No. 38, p. 8. But neither the Preamble nor Defendants even begins to contend with the basic fact that ICE simply cannot produce local records that it does not possess. As this Court stated when it denied Defendant's motion to dismiss: "To the extent the government seeks to argue that ICE can obtain and control these records, it is free to develop those facts as the case progresses." Op. & Order, ECF No. 27, p. 8 n.3. Defendants have not, and cannot, do so. *See*

[8] Defendants failed to produce these comments as part of the administrative record. *See* Notice, ECF No. 35. Defendants' failure means that Plaintiffs can rely only on the summary of the comments in the Preamble and make reasonable inferences about their full scope.

[9] Separately, the Preamble surprisingly adds that "the Tenth Amendment is not implicated" by the Rule despite clearly regulating the states. 68 Fed Reg. at 4365; *see also id.* at 4367 ("[T]his rule does not have sufficient Federalism implications to warrant the preparation of a federalism summary impact statement.").

*id.* (citing *Aguiar v. DEA*, 865 F.3d 730, 735 (D.C. Cir. 2017)) (observing that FOIA applies only to documents that "an agency both (1) creates or obtains, and (2) controls at the time the FOIA request was made." (cleaned up)).

If the agency's insufficient explanation for the fate of local detention records was based on a misunderstanding of how federal FOIA works, that alone renders the rule arbitrary and capricious. *Cf. Humane Soc'y*, 865 F.3d at 614 (failure to consider the proper applicability of a relevant federal statute renders a decision arbitrary and capricious). If the insufficient explanation was simply because the agency did not understand the obvious consequence of the agency not actually possessing routine local detention records covered by the Rule, that too is a straightforward violation of the APA. *See Cook Cnty. v. Wolf*, 962 F.3d 208, 233 (7th Cir. 2020) (a rule is arbitrary and capricious when the agency "did not acknowledge or address the significant, predictable collateral consequences of the Rule . . . ."). No matter the underlying reason, it is clear that the agency "entirely failed to consider an important aspect of the problem," *State Farm,* 463 U.S. at 43, rendering the Records Rule arbitrary and capricious, at least insofar as it inexplicably prohibits state and local entities from disclosing their own records that ICE does not independently possess.

***b. The Records Rule does not adequately explain the connection between the Rule's scope and the problem it sought to address.***

Despite the federal government's main justification for the Records Rule being its post-9/11 national security concerns relating to the detention of noncitizens suspected of terrorism, the Records Rule indiscriminately bars the disclosure of records related to *any and all* detained noncitizens, regardless of the alleged violation for which they are detained. Absent an adequate explanation for such an expansive scope, this "failure to take account of circumstances that appear

to warrant different treatment for different parties" renders the Records Rule plainly arbitrary and capricious. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994).

The Records Rule was initially promulgated in response to an unprecedented national security crisis: the September 11, 2001, terrorist attacks. The Preamble and the Defendants' Motion make clear that the Rule was primarily motivated by 9/11-related national security concerns. The Preamble uses the phrase "national security" eleven times in just four pages. As Defendants themselves note, "the Department determined that the inappropriate release of information concerning detained noncitizens could provide those who were averse to the United States with intelligence that was harmful to national security and law enforcement interests." Defs.' Mot., ECF No. 38, p. 1; *see also* 68 Fed. Reg. at 4366 ("In this post-September 11, 2001, era of heightened national security concerns . . . the inappropriate release of information concerning detained [noncitizens] can provide hostile interests with intelligence harmful to the national security and law enforcement interests of the United States."); 67 Fed. Reg. 19508, 19510 (interim rule preamble pointing to "the national emergency declared by the President on September 14, 2001 . . . and the continuing threat by terrorists to the security of the United States" as reasons to issue the rule without notice-and-comment). But the Rule does not narrowly target people detained on suspicion of terrorism or another emergent national security threat. It applies to *every* person detained in a state or local facility for *any* alleged immigration violation.

Every month, Defendants detain tens of thousands of people, many of whom are detained in dozens of state and local jails (including four in Michigan alone).[10] Over 70% of detained

---

[10] Deportation Data Project, *Number of Book-Ins to ICE Detention by Month*, www.deportationdata.org (last visited Nov. 6, 2026); U.S. Immigration and Customs Enforcement, *Detention Facilities*, https://www.ice.gov/detention-facilities (last visited Nov. 6, 2026).

noncitizens have no criminal convictions, and many of those with convictions have been convicted only of minor offenses and traffic violations.[11] It is implausible that the national security concerns motivating this post-9/11 rule apply to any more than a tiny fraction of detainees nationwide. Yet neither the Preamble nor the Defendants' Motion offers any account for "circumstances that appear to warrant different treatment for different parties," such as why the average noncitizen who overstayed a visa or is being removed for alleged shoplifting should be subjected to the same broad non-disclosure rule as someone detained for posing a national security threat. *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 403 (D.C. Cir. 1994). Issuing a rule that applies indiscriminately to both the overwhelming majority of noncitizens detained in state and local jails, who present no national security concerns, and the small minority who do requires at least some reasoned explanation. *See State Farm.*, 463 U.S. at 43. The Preamble and Defendants provide none. Defendants have failed to provide an adequate explanation for the connection between the underlying problem and the indiscriminate choice made, and therefore the Records Rule is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). *See Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 809 (D. Md. 2025) ("[T]he government has not even attempted to explain why a more tailored, measured, titrated approach is not suitable to the task . . . . Its method of doing so is tantamount to hitting a fly with a sledgehammer.").

### III. Defendants' Discussion of Facial Challenges Is Misplaced Because Plaintiffs Are Not Seeking Wholesale Vacatur of the Records Rule.

Defendants spend a significant portion of their motion describing Plaintiffs' claims as a facial challenge to the Records Rule and discussing the standards courts have applied to facial challenges. *See* ECF No. 38, pp. 5–6, 9–10. But Defendants mischaracterize Plaintiffs' claims in

---

[11] Transactional Records Access Clearinghouse, *Immigration Detention Quick Facts*, https://tracreports.org/immigration/quickfacts/ (last visited Nov. 6, 2026).

an attempt to shoehorn them into inapposite caselaw about challenges that, unlike this one, seek wholesale vacatur of an entire rule. The reality is that Plaintiffs challenge only certain applications of the Records Rule and seek partial vacatur *as to those applications*. That type of claim and relief are widely recognized under the APA and do not trigger the facial-challenge standards invoked by Defendants, so this Court need not hesitate to award such relief here.

Since the beginning of this case, Plaintiffs have sought *partial* vacatur of the Records Rule "insofar as it prohibits state and local entities, such as county jails, from disclosing local records that ICE does not possess." Compl., ECF No. 1, at ¶ 86. *See also id.* at ¶ 89; Pl. Br., ECF No. 25, p. 1 ("Specifically, Plaintiffs challenge the Records Rule as applied to local records that Defendants do not possess, and that therefore cannot be obtained via the federal Freedom of Information Act (FOIA)."). This relief is not, as Defendants suggest, a facial challenge to the Rule in all its applications. Instead, the partial vacatur Plaintiffs are seeking is the kind of unremarkable and well-established relief that this Court has regularly granted, and that the D.C. Circuit has regularly upheld. *See, e.g., Shalala*, 12 F.3d at 1128 (courts may vacate only "the part of a rule found to be invalid" under the APA); *Metro. Gov't of Nashville & Davidson Cnty.*, --- F. Supp. 3d --- at *9 (recognizing the availability of "partial vacatur" in APA cases); *cf. Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81–82 (D.C. Cir. 2020) ("[W]hen a court encounters statutory or regulatory text that is invalid as applied to one state of facts and yet valid as applied to another, it should try to limit the solution to the problem by, for instance, enjoining the problematic applications while leaving other applications in force.") (cleaned up); *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 190 (D.C. Cir. 2022) (vacating portions of a Federal Energy Regulatory Commission decision because they were arbitrary and capricious, while leaving the remaining decision intact).

The cases cited by Defendants simply do not apply to the type of claims and partial relief that is sought in this case. Those cases involved pure facial challenges wherein the plaintiffs did not allege that any specific application or interpretation of the challenged actions was problematic. *See, e.g., Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022) (applying facial challenge standards because the plaintiff sought "wholesale vacatur of [a] Rule."). Instead, those plaintiffs—at most—challenged the agency action by relying upon hypothetical illegal scenarios that could result from the agency rule. *See, e.g., Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011) (dismissing a hypothetical application posed by the plaintiff as "irrelevant" because "it is not enough for the plaintiffs to show the Guidelines *could be* applied unlawfully." (emphasis added)). Naturally, the courts have resisted "such speculation" from "be[ing] the basis for declaring the regulations facially invalid." *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 454 (D.C. Cir. 2012). *See also Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1188 (D.C. Cir. 2020) ("But the Court need not fret about hypothetical state regulations now—nor need it resolve every hypothetical presented in Petitioners' briefs.").

In stark contrast, the Court here is presented with specific real-world applications of the Records Rule which have actually injured Plaintiffs multiple times. And, in turn, the Court is presented with a request for partial vacatur only as to the type of local-record applications Plaintiffs have shown to be unlawful.[12] The Court should grant the limited relief sought by Plaintiffs and decline Defendants' invitation to inflate the scope of this case beyond what Plaintiffs have alleged and asked for.

---

[12] Plaintiffs do not, however, seek relief only as to themselves. The "normal remedy" for an APA violation is vacatur of the challenged regulation, not Plaintiff-specific injunctive relief. *See Ky. Mun. Energy Agency*, 45 F.4th at 179.

## CONCLUSION

For any of the foregoing reasons, Plaintiffs respectfully ask this Court to enter summary judgment in favor of Plaintiffs and vacate the Records Rule insofar as it prohibits state and local agencies from disclosing records they created and maintain, and which Defendants do not independently possess. The Court should also deny Defendants' motion for the same reasons.

Respectfully submitted,

*/s/ Ramis J. Wadood*
Ramis J. Wadood*
Marc Allen*
Philip E. Mayor*
Bonsitu Kitaba-Gaviglio*
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800
rwadood@aclumich.org
mallen@aclumich.org
pmayor@aclumich.org
bkitaba@aclumich.org

*/s/ My Khanh Ngo*
My Khanh Ngo (D.D.C. Bar #CA00219)
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
Phone: (415) 343-0770
mngo@aclu.org

*/s/ Kyle Virgien*
Kyle Virgien*
American Civil Liberties Union Foundation
National Prison Project
425 California Street, 7th Floor
San Francisco, CA 94104
Phone: (415) 343-0770
kvirgien@aclu.org

Attorneys for Plaintiffs

*Admitted *pro hac vice*

Dated: November 10, 2026